## NORTH DAKOTA ET AL. *v.* UNITED STATES

No. 88–926.   Argued October 31, 1989—Decided May 21, 1990

424

STEVENS, J., announced the judgment of the Court and delivered an opinion, in which REHNQUIST, C. J., and WHITE and O'CONNOR, JJ., joined. SCALIA, J., filed an opinion concurring in the judgment, *post*, p. 444. BRENNAN, J., filed an opinion concurring in the judgment in part and dissenting in part, in which MARSHALL, BLACKMUN, and KENNEDY, JJ., joined, *post*, p. 448.

*Nicholas J. Spaeth,* Attorney General of North Dakota, argued the cause for appellants.   With him on the brief were *Steven E. Noack* and *Laurie J. Loveland,* Assistant Attorneys General.

*Michael R. Lazerwitz* argued the cause for the United States.   With him on the brief were *Solicitor General Starr, Assistant Attorney General Peterson, Deputy Solicitor General Wallace,* and *Richard Farber.\**

JUSTICE STEVENS announced the judgment of the Court and delivered an opinion, in which THE CHIEF JUSTICE, JUSTICE WHITE, and JUSTICE O'CONNOR join.

The United States and the State of North Dakota exercise concurrent jurisdiction over the Grand Forks Air Force Base and the Minot Air Force Base.   Each sovereign has its own separate regulatory objectives with respect to the area over which it has authority.   The Department of Defense (DoD), which operates clubs and package stores located on those bases, has sought to reduce the price that it pays for alcoholic beverages sold on the bases by instituting a system of competitive bidding.   The State, which has established a liquor distribution system in order to promote temperance and ensure orderly market conditions, wishes to protect the integrity of that system by requiring out-of-state shippers to file monthly reports and to affix a label to each bottle of liquor sold to a federal enclave for domestic consumption.   The clash between the State's interest in preventing the diversion of liquor and the federal interest in obtaining the lowest possible price forms the basis for the Federal Government's Supremacy Clause and pre-emption challenges to the North Dakota regulations.

---

\*Briefs of *amici curiae* urging reversal were filed for the National Alcoholic Beverage Control Association et al. by *James M. Goldberg;* for the National Beer Wholesalers' Association, Inc., by *Ernest Gellhorn* and *Erwin N. Griswold;* and for the National Conference of State Legislatures et al. by *Benna Ruth Solomon, Beate Bloch,* and *Barry Friedman.*

I

The United States sells alcoholic beverages to military personnel and their families at clubs and package stores on its military bases. The military uses revenue from these sales to support a morale, welfare, and recreation program for personnel and their families. See 32 CFR § 261.3 (1989); DoD Directive 1015.1 (Aug. 19, 1981). Before December 1985, no federal statute governed the purchase of liquor for these establishments. From December 19, 1985, to October 19, 1986, federal law required military bases to purchase alcoholic beverages only within their home State. See Pub. L. 99–190, § 8099, 99 Stat. 1219. Effective October 30, 1986, Congress eliminated the requirement that the military purchase liquor from within the State and directed that distilled spirits be "procured from the most competitive source, price and other factors considered." Pub. L. 99–661, § 313, 100 Stat. 3853, 10 U. S. C. § 2488(a).[1]

In accordance with this statute, the DoD has developed a joint-military purchasing program to buy liquor in bulk directly from the Nation's primary distributors who offer the lowest possible prices. Purchases are made pursuant to a DoD regulation which provides:

> "'The Department of Defense shall cooperate with local, state, and federal officials to the degree that their duties relate to the provisions of this chapter. However, the purchase of all alcoholic beverages for resale at any camp, post, station, base, or other DoD installation within the United States shall be in such a manner and under such conditions as shall obtain for the government the most advantageous contract, price and other considered factors. These other factors shall not be construed as meaning any submission to state control, nor shall co-

---

[1] Congress kept the rule requiring in-state purchases of distilled spirits for installations in Hawaii and Alaska and of beer and wine for installations throughout the United States. Act of Oct. 30, 1986, Pub. L. 99–591, § 9090, 100 Stat. 3341–116.

operation be construed or represented as an admission of any legal obligation to submit to state control, pay state or local taxes, or purchase alcoholic beverages within geographical boundaries or at prices or from suppliers prescribed by any state.'" 32 CFR § 261.4 (1989).

Since long before the enactment of the most recent procurement statute, the State of North Dakota has regulated the importation and distribution of alcoholic beverages within its borders. See N. D. Cent. Code ch. 5 (1987 and Supp. 1989). Under the State's regulatory system, there are three levels of liquor distributors: out-of-state distillers/suppliers, state-licensed wholesalers, and state-licensed retailers. Distillers/suppliers may sell to only licensed wholesalers or federal enclaves. N. D. Admin. Code § 84–02–01–05(2) (1986). Licensed wholesalers, in turn, may sell to licensed retailers, other licensed wholesalers, and federal enclaves. N. D. Cent. Code § 5–03–01 (1987). Taxes are imposed at both levels of distribution. N. D. Cent. Code § 5–03–07 (1987); N. D. Cent. Code ch. 57–39.2 (Supp. 1989). In order to monitor the importation of liquor, the State since 1978 has required all persons bringing liquor into the State to file monthly reports documenting the volume of liquor they have imported. The reporting regulation provides:

"All persons sending or bringing liquor into North Dakota shall file a North Dakota Schedule A Report of all shipments and returns for each calender month with the state treasurer. The report must be postmarked on or before the fifteenth day of the following month." N. D. Admin. Code § 84–02–01–05(1) (1986).

Since 1986, the State has also required out-of-state distillers who sell liquor directly to a federal enclave to affix labels to each individual item, indicating that the liquor is for domestic consumption only within the federal enclave. The labels may be purchased from the state treasurer for a small sum or printed by the distillers/suppliers themselves accord-

ing to a state-approved format. App. 34. The labeling regulation provides:

"All liquor destined for delivery to a federal enclave in North Dakota for domestic consumption and not transported through a licensed North Dakota wholesaler for delivery to such bona fide federal enclave in North Dakota shall have clearly identified on each individual item that such shall be for consumption within the federal enclave exclusively. Such identification must be in a form and manner prescribed by the state treasurer." N. D. Admin. Code § 84–02–01–05(7) (1986).

Within the State of North Dakota, the United States operates two military bases: Grand Forks Air Force Base and Minot Air Force Base. The State and Federal Government exercise concurrent jurisdiction over both.[2] Shortly after the effective date of the procurement statute permitting the military to make purchases from out of state, the state treasurer conducted a meeting with out-of-state suppliers to explain the labeling and reporting requirements. App. 34. Five out-of-state distillers and importers thereupon informed federal military procurement officials that they would not ship liquor to the North Dakota bases because of the burden of complying with the North Dakota regulations.[3] A sixth supplier, Kobrand Importers, Inc., increased its prices from between $0.85 and $20.50 per case to reflect the cost of labeling and reporting.

[2] The parties stipulated to concurrent jurisdiction but offered no further information. App. 16. A territory under concurrent jurisdiction is generally subject to the plenary authority of both the Federal Government and the State for the purposes of the regulation of liquor as well as the exercise of other police powers. See, e. g., United States v. Mississippi Tax Comm'n, 412 U. S. 363, 379–380 (1973); James v. Dravo Contracting Co., 302 U. S. 134, 141–142 (1937); Surplus Trading Co. v. Cook, 281 U. S. 647, 650–651 (1930). The parties have not argued that North Dakota ceded its authority to regulate the importation of liquor destined for federal bases.

[3] The five are Heublein, Inc., James B. Beam, Joseph Seagram & Sons, Inc., Somerset Importers, and Hiram Walker & Sons, Inc. App. 26.

The United States instituted this action in the United States District Court for the District of North Dakota seeking declaratory and injunctive relief against the application of the State's regulations to liquor destined for federal enclaves. The District Court denied the United States' cross-motion for summary judgment and granted the State's motion. The court reasoned that there was no conflict between the state and federal regulations because the state regulations did not prevent the Government from obtaining beverages at the "lowest cost." 675 F. Supp. 555, 557 (1987). A divided United States Court of Appeals for the Eighth Circuit reversed. 856 F. 2d 1107 (1988). While recognizing that "nothing in the record compels us to believe that the regulations are a pretext to require in-state purchases," *id.*, at 1113, the majority held that the regulations impermissibly made out-of-state distillers less competitive with local wholesalers. *Ibid.* Chief Judge Lay argued in dissent that the effect on the Federal Government was a permissible incident of regulations passed pursuant to the State's powers under the Twenty-first Amendment. *Id.*, at 1115–1116. We noted probable jurisdiction, 489 U. S. 1095 (1989), and now reverse.

II

The Court has considered the power of the States to pass liquor control regulations that burden the Federal Government in four cases since the ratification of the Twenty-first Amendment.[4] See *Collins* v. *Yosemite Park & Curry Co.*, 304 U. S. 518 (1938); *Hostetter* v. *Idlewild Bon Voyage Liquor Corp.*, 377 U. S. 324 (1964); *United States* v. *Mississippi Tax Comm'n*, 412 U. S. 363 (1973) *(Mississippi Tax Comm'n I)*; *United States* v. *Mississippi Tax Comm'n*, 421 U. S. 599 (1975) *(Mississippi Tax Comm'n II)*; see also *Johnson* v.

---

[4] Section 2 of the Twenty-first Amendment provides:

"The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited."

*Yellow Cab Transit Co.*, 321 U. S. 383 (1944). In each of those cases, we concluded that the State has no authority to regulate in an area or over a transaction that fell outside of its jurisdiction. In *Collins*, we held that the Twenty-first Amendment did not give the States the power to regulate the use of alcohol within a national park over which the Federal Government had exclusive jurisdiction. In *Hostetter*, we held that the Twenty-first Amendment conferred no authority to license the sale of tax-free liquors at an airport for delivery to foreign destinations made under the supervision of the United States Bureau of Customs. *Mississippi Tax Comm'n I* held that the State had no authority to regulate a transaction between an out-of-state liquor supplier and a federal military base within the exclusive federal jurisdiction. And, in *Mississippi Tax Comm'n II*, we held that the State has no authority to tax directly a federal instrumentality on an enclave over which the United States exercised concurrent jurisdiction.

At the same time, however, within the area of its jurisdiction, the State has "virtually complete control" over the importation and sale of liquor and the structure of the liquor distribution system. See *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.*, 445 U. S. 97, 110 (1980); see also *Capital Cities Cable, Inc.* v. *Crisp*, 467 U. S. 691, 712 (1984); *California Board of Equalization* v. *Young's Market Co.*, 299 U. S. 59 (1936). The Court has made clear that the States have the power to control shipments of liquor during their passage through their territory and to take appropriate steps to prevent the unlawful diversion of liquor into their regulated intrastate markets. In *Hostetter*, we stated that our decision in *Collins*, striking down the California Alcoholic Beverage Control Act as applied to an exclusive federal reservation, might have been otherwise if "California had sought to regulate or control the transportation of the liquor there involved from the time of its entry into the State until its delivery at the national park, in the interest of pre-

venting unlawful diversion into her territory." 377 U. S., at 333. We found that the state licensing law there under attack was unlawful because New York "ha[d] not sought to regulate or control the passage of intoxicants through her territory in the interest of preventing their unlawful diversion into the internal commerce of the State. As the District Court emphasized, this case does not involve 'measures aimed at preventing unlawful diversion or use of alcoholic beverages within New York.' 212 F. Supp., at 386." *Id.*, at 333–334.

In *Mississippi Tax Comm'n I*, *supra*, after holding that the State could not impose its normal markup on sales to the military bases, we added that "a State may, in the absence of conflicting federal regulation, properly exercise its police powers to regulate and control such shipments during their passage through its territory insofar as necessary to prevent the 'unlawful diversion' of liquor 'into the internal commerce of the State.'" 412 U. S., at 377–378 (citations omitted).

The two North Dakota regulations fall within the core of the State's power under the Twenty-first Amendment. In the interest of promoting temperance, ensuring orderly market conditions, and raising revenue, the State has established a comprehensive system for the distribution of liquor within its borders. That system is unquestionably legitimate. See *Carter* v. *Virginia*, 321 U. S. 131 (1944); *California Board of Equalization* v. *Young's Market Co.*, 299 U. S. 59 (1936). The requirements that an out-of-state supplier which transports liquor into the State affix a label to each bottle of liquor destined for delivery to a federal enclave and that it report the volume of liquor it has transported are necessary components of the regulatory regime. Because liquor sold at Grand Forks and Minot Air Force Bases has been purchased directly from out-of-state suppliers, neither the markup nor the state taxes paid by liquor wholesalers and retailers in North Dakota is reflected in the military purchase price. Moreover, the federal enclaves are not governed by

state laws with respect to the sale of intoxicants; the military establishes the type of liquor it sells, the minimum age of buyers, and the days and times its package stores will be open. The risk of diversion into the retail market and disruption of the liquor distribution system is thus both substantial and real.[5] It is necessary for the State to record the volume of liquor shipped into the State and to identify those products which have not been distributed through the State's liquor distribution system. The labeling and reporting requirements unquestionably serve valid state interests.[6] Given the special protection afforded to state liquor control policies by the Twenty-first Amendment, they are supported by a strong presumption of validity and should not be set aside lightly. See, e. g., *Capital Cities Cable, Inc.* v. *Crisp*, 467 U. S., at 714.

---

[5] A member of the National Conference of State Liquor Administrators executed an affidavit describing the following types of misconduct that North Dakota liquor regulations are intended to prevent:

"a. Diversion of alcohol off a federal enclave in Hawaii by a dependent of a Department of Defense employee in quantities large enough to supply the dependent's own liquor store in the private sector.

"b. Loss of quantities of alcohol from the time the supplier delivered the product to the Department of Defense personnel to the time when the product was to be inventoried or taken by Department of Defense personnel to another facility.

"c. Purchases of alcohol is [sic] quantities so large that the only logical explanation is that the alcohol was diverted from the military base into a state's stream of commerce. This occurred in the state of Washington as documented by the Washington State Liquor Control Board's February 20, 1987, letter to Mr. Chapman Cox, Assistant Secretary of Defense at the Pentagon in Washington, D. C. A copy of that letter is attached hereto as Attachment 1. The Washington State Liquor Control Board letter describes purchases of alcohol in quantities so large that on-base personnel would have had to individually consume 85 cases each during the fiscal year 1986. This amounts to 1,020 bottles or approximately 5 bottles per person per day, including Sundays and holidays." App. 36.

[6] Cf. *Rice* v. *Rehner*, 463 U. S. 713, 724 (1983) ("The State has an unquestionable interest in the liquor traffic that occurs within its borders").

## III

State law may run afoul of the Supremacy Clause in two distinct ways: The law may regulate the Government directly or discriminate against it, see *McCulloch* v. *Maryland*, 4 Wheat. 316, 425–437 (1819), or it may conflict with an affirmative command of Congress. See *Gibbons* v. *Ogden*, 9 Wheat. 1, 211 (1824); see also *Hillsborough County* v. *Automated Medical Laboratories, Inc.*, 471 U. S. 707, 712–713 (1985). The Federal Government's attack on the regulations is based on both grounds of invalidity.

The Government argues that the state provisions governing the distribution of liquor by out-of-state shippers "regulate" governmental actions and are therefore invalid directly under the Supremacy Clause. The argument is unavailing. State tax laws, licensing provisions, contract laws, or even "a statute or ordinance regulating the mode of turning at the corner of streets," *Johnson* v. *Maryland*, 254 U. S. 51, 56 (1920), no less than the reporting and labeling regulations at issue in this case, regulate federal activity in the sense that they make it more costly for the Government to do its business. At one time, the Court struck down many of these state regulations, see *Panhandle Oil Co.* v. *Mississippi ex rel. Knox*, 277 U. S. 218, 222 (1928) (state tax on military contractor); *Dobbins* v. *Commissioners of Erie County*, 16 Pet. 435 (1842) (tax on federal employee); *Gillespie* v. *Oklahoma*, 257 U. S. 501 (1922) (tax on lease of federal property); *Weston* v. *City Council of Charleston*, 2 Pet. 449 (1829) (tax on federal bond), on the theory that they interfered with "the constitutional means which have been legislated by the government of the United States to carry into effect its powers." *Dobbins*, 16 Pet., at 449. Over 50 years ago, however, the Court decisively rejected the argument that any state regulation which indirectly regulates the Federal Government's activity is unconstitutional, see *James* v. *Dravo Contracting Co.*, 302 U. S. 134 (1937), and that view has now been "thor-

oughly repudiated." *South Carolina* v. *Baker*, 485 U. S. 505, 520 (1988); see also *California Board of Equalization* v. *Sierra Summit, Inc.*, 490 U. S. 844, 848 (1989); *Cotton Petroleum Corp.* v. *New Mexico*, 490 U. S. 163, 174 (1989).

The Court has more recently adopted a functional approach to claims of governmental immunity, accommodating of the full range of each sovereign's legislative authority and respectful of the primary role of Congress in resolving conflicts between the National and State Governments. See *United States* v. *County of Fresno*, 429 U. S. 452, 467–468 (1977); cf. *Garcia* v. *San Antonio Metropolitan Transit Auth.*, 469 U. S. 528 (1985). Whatever burdens are imposed on the Federal Government by a neutral state law regulating its suppliers "are but normal incidents of the organization within the same territory of two governments." *Helvering* v. *Gerhardt*, 304 U. S. 405, 422 (1938); see also *South Carolina* v. *Baker*, 485 U. S., at 520–521; *Penn Dairies, Inc.* v. *Milk Control Comm'n of Pennsylvania*, 318 U. S. 261, 271 (1943); *Graves* v. *New York ex rel. O'Keefe*, 306 U. S. 466, 487 (1939). A state regulation is invalid only if it regulates the United States directly or discriminates against the Federal Government or those with whom it deals. *South Carolina* v. *Baker*, 485 U. S., at 523; *County of Fresno*, 429 U. S., at 460. In addition, the question whether a state regulation discriminates against the Federal Government cannot be viewed in isolation. Rather, the entire regulatory system should be analyzed to determine whether it is discriminatory "with regard to the economic burdens that result." *Washington* v. *United States*, 460 U. S. 536, 544 (1983). Claims to any further degree of immunity must be resolved under principles of congressional pre-emption. See, *e. g.*, *Penn Dairies, Inc.* v. *Milk Control Comm'n*, 318 U. S., at 271; *James* v. *Dravo Contracting Co.*, 302 U. S., at 161.[7]

---

[7] Thus, for example, in *Public Utilities Comm'n of California* v. *United States*, 355 U. S. 534 (1958), we put to one side "cases where, absent a conflicting federal regulation, a State seeks to impose safety or other require-

Application of these principles to the North Dakota regulations demonstrates that they do not violate the intergovernmental immunity doctrine. There is no claim in this case, nor could there be, that North Dakota regulates the Federal Government directly. See *United States* v. *New Mexico*,

---

ments on a contractor who does business for the United States." *Id.*, at 543. We invalidated the state law because there was a clear conflict between the state policy of regulation of negotiated rates and the federal policy, expressed in statute and regulation, of negotiated rates. *Id.*, at 544. Similarly, in *Leslie Miller, Inc.* v. *Arkansas*, 352 U. S. 187 (1956), the state licensing law came into direct conflict with "the action which Congress and the Department of Defense ha[d] taken to insure the reliability of persons and companies contracting with the Federal Government." *Id.*, at 190. *Paul* v. *United States*, 371 U. S. 245 (1963), involved the Armed Services Procurement Act and regulations promulgated thereunder. We stated that the collision between the federal policy, expressed in these laws, and the state policy was "clear and acute." *Id.*, at 253. In *United States* v. *Georgia Public Service Comm'n*, 371 U. S. 285 (1963), we relied upon the passage by Congress of the Federal Property and Administrative Services Act, which spoke too clearly to permit any state regulation of competitive bidding or negotiation.

In discussing why it was proper to convene a three-judge court, the Court in *Georgia Public Service Comm'n* did state: "Direct conflict between a state law and federal constitutional provisions raises of course a question under the Supremacy Clause but one of broader scope than where the alleged conflict is only between a state statute and a federal statute that might be resolved by the construction given either the state or the federal law." *Id.*, at 287 (citing *Kesler* v. *Department of Public Safety of Utah*, 369 U. S. 153 (1962)). That statement constituted an explanation for the assertion of jurisdiction, not an expression of a general principle of implied intergovernmental immunity. Under 28 U. S. C. § 2281 (1970 ed.), a three-judge court was required whenever a state statute was sought to be enjoined "upon the ground of the unconstitutionality of such statute"; *Kesler* held that such a court was required, and the Constitution was implicated, when the conflicting state and federal laws were clear. *Georgia Public Service Comm'n* raised a "broader" question because it could not "be resolved by the construction given either the state or the federal law." 371 U. S., at 287. In *Swift & Co.* v. *Wickham*, 382 U. S. 111 (1965), we overruled *Kesler* and explained that the variant of Supremacy Clause jurisprudence there discussed was that which is implicated when "a state measure conflicts with a federal requirement." 382 U. S., at 120.

455 U. S. 720 (1982); *Hancock* v. *Train*, 426 U. S. 167 (1976); *Mississippi Tax Comm'n II*, 421 U. S., at 608–610; *Mayo* v. *United States*, 319 U. S. 441, 447 (1943). Both the reporting requirement and the labeling regulation operate against suppliers, not the Government, and concerns about direct interference with the Federal Government, see *City of Detroit* v. *Murray Corp. of America*, 355 U. S. 489, 504–505 (1958) (opinion of Frankfurter, J.), therefore are not implicated. In this respect, the regulations cannot be distinguished from the price control regulations and taxes imposed on Government contractors that we have repeatedly upheld against constitutional challenge. See *United States* v. *City of Detroit*, 355 U. S. 466 (1958); *Penn Dairies, Inc.*, 318 U. S., at 279–280; *Alabama* v. *King & Boozer*, 314 U. S. 1, 8 (1941).[8]

Nor can it be said that the regulations discriminate against the Federal Government or those with whom it deals. The nondiscrimination rule finds its reason in the principle that the States may not directly obstruct the activities of the Fed-

---

[8] JUSTICE BRENNAN would strike down the labeling regulation because it subjects the military to special surcharges and forces it to pay higher in-state prices. *Post*, at 458. Yet, he would uphold the reporting requirement, whose costs are also a component of the out-of-state supplier's expenses, presumably on the grounds that there has been no showing that those costs have been passed on to the military. *Post*, at 464, n. 9. Whereas five companies stopped supplying the military after the labeling regulation went into effect and a sixth raised prices by as much as $20.50 per case, *post*, at 458, the Government introduced no evidence that the reporting regulation interfered with the military's policy of purchasing from the most competitive source. *Post*, at 464, n. 9. JUSTICE BRENNAN's test contains no standard by which "burdensomeness" may be measured. Would a state regulation that forced one company to stop dealing with the Government be invalid? What about a regulation that raised prices to the military, not by $20.50, but by $5 a case? We prefer to rely upon our traditional standard of "burden"—that specified by Congress and, in its absence, that which exceeds the burden imposed on other comparably situated citizens of the State—and decline to embark on an approach that would either result in the invalidation or the trial, by some undisclosed standard, of every state regulation that in any way touched federal activity.

eral Government. *McCulloch* v. *Maryland*, 4 Wheat., at 425–437.[9] Since a regulation imposed on one who deals with the Government has as much potential to obstruct governmental functions as a regulation imposed on the Government itself, the Court has required that the regulation be one that is imposed on some basis unrelated to the object's status as a Government contractor or supplier, that is, that it be imposed equally on other similarly situated constituents of the State. See, *e. g.*, *United States* v. *County of Fresno*, 429 U. S., at 462–464. Moreover, in analyzing the constitutionality of a state law, it is not appropriate to look to the most narrow provision addressing the Government or those with whom it deals. A state provision that appears to treat the Government differently on the most specific level of analysis may, in its broader regulatory context, not be discriminatory. We have held that "[t]he State does not discriminate against the Federal Government and those with whom it deals unless it treats someone else better than it treats them." *Washington* v. *United States*, 460 U. S., at 544–545.[10]

The North Dakota liquor control regulations, the regulatory regime of which the Government complains, do not disfavor the Federal Government but actually favor it. The

---

[9] "The danger of hindrance of the Federal Government in the use of its property, resulting in erosion of the fundamental command of the Supremacy Clause, is at its greatest when the State may, through regulation or taxation, move directly against the activities of the Government." *City of Detroit* v. *Murray Corp. of America*, 355 U. S. 489, 504 (1958) (opinion of Frankfurter, J.).

[10] In our opinion in *Washington* v. *United States*, we made the following comment on our holding in *United States* v. *County of Fresno*, 429 U. S. 452 (1977):

"We rejected the United States' contention that the tax system discriminated against lessees of federal property. Because the economic burden of a tax imposed on the owner of nonexempt property is ordinarily passed on to the lessee, we explained that those who leased property from the Federal Government were no worse off than their counterparts in the private sector. 429 U. S., at 464–465." 460 U. S., at 543.

labeling and reporting regulations are components of an extensive system of statewide regulation that furthers legitimate interests in promoting temperance and controlling the distribution of liquor, in addition to raising revenue. The system applies to all liquor retailers in the State. In this system, the Federal Government is favored over all those who sell liquor in the State. All other liquor retailers are required to purchase from state-licensed wholesalers, who are legally bound to comply with the State's liquor distribution system. N. D. Cent. Code § 5–03–01.1 (1987). The Government has the option, like the civilian retailers in the State, to purchase liquor from licensed wholesalers. However, alone among retailers in the State, the Government also has the *option* to purchase liquor from out-of-state wholesalers if those wholesalers comply with the labeling and reporting regulations. The system does not discriminate "with regard to the economic burdens that result." *Washington*, 460 U. S., at 544. A regulatory regime which so favors the Federal Government cannot be considered to discriminate against it.

## IV

The conclusion that the labeling regulation does not violate the intergovernmental immunity doctrine does not end the inquiry into whether the regulation impermissibly interferes with federal activities. Congress has the power to confer immunity from state regulation on Government suppliers beyond that conferred by the Constitution alone, see, *e. g.*, *United States* v. *New Mexico*, 455 U. S., at 737–738; *Penn Dairies, Inc.*, 318 U. S., at 275, even when the state regulation is enacted pursuant to the State's powers under the Twenty-first Amendment. *Capital Cities Cable, Inc.* v. *Crisp*, 467 U. S., at 713. But when the Court is asked to set aside a regulation at the core of the State's powers under the Twenty-first Amendment, as when it is asked to recognize an implied exemption from state taxation, see *Rockford Life*

*Ins. Co.* v. *Illinois Dept. of Revenue,* 482 U. S. 182, 191 (1987), it must proceed with particular care.   *Capital Cities Cable,* 467 U. S., at 714.   Congress has not here spoken with sufficient clarity to pre-empt North Dakota's attempt to protect its liquor distribution system.

The Government's claim that the regulations are pre-empted rests upon a federal statute and federal regulation. The federal statute is 10 U. S. C. § 2488, which governs the procurement of alcoholic beverages by nonappropriated fund instrumentalities.   It provides simply that purchases of alcoholic beverages for resale on military installations "shall be made from the most competitive source, price and other factors considered," § 2488(a)(1), but that malt beverages and wine shall be purchased from sources within the State in which the installation is located.   It may be inferred from the latter provision as well as from the provision, elsewhere in the Code, that alcoholic beverages purchased for resale in Alaska and Hawaii must be purchased in state, Act of Oct. 30, 1986, Pub. L. 99–591, § 9090, 100 Stat. 3341–116, that Congress intended for the military to be free in the other 48 States to purchase liquor from out-of-state wholesalers.   It follows that the States may not directly restrict the military from purchasing liquor out of state.   That is the central lesson of our decisions in *Paul* v. *United States,* 371 U. S. 245 (1963); *United States* v. *Georgia Public Service Comm'n,* 371 U. S. 285 (1963); *Public Utilities Comm'n of California* v. *United States,* 355 U. S. 534 (1958); and *Leslie Miller, Inc.* v. *Arkansas,* 352 U. S. 187 (1956), in which we invalidated state regulations that prohibited what federal law required.   We stated in *Paul* that there was a "collision . . . clear and acute," between the federal law which required competitive bidding among suppliers and the state law which directly limited the extent to which suppliers could compete.   371 U. S., at 253.

It is one thing, however, to say that the State may not pass regulations which directly obstruct federal law; it is quite

another to say that they cannot pass regulations which incidentally raise the costs to the military. Any number of state laws may make it more costly for the military to purchase liquor. As Chief Judge Lay observed in dissent, "[c]ompliance with regulations regarding the importation of raw materials, general operations of the distillery or brewery, treatment of employees, bottling, and shipping necessarily increase the cost of liquor." 856 F. 2d, at 1116. Highway tax laws and safety laws may make it more costly for the military to purchase from out-of-state shippers.

The language used in the 1986 procurement statute does not expressly pre-empt any of these state regulations or address the problem of unlawful diversion of liquor from military bases into the civilian market. It simply states that covered alcoholic beverages shall be obtained from the most competitive source, price and other factors considered. As the District Court observed, however, "'[l]owest cost' is a relative term." 675 F. Supp., at 557. The fact that the reporting and labeling regulations, like safety laws or minimum wage laws, increase the costs for out-of-state shippers does not prevent the Government from obtaining liquor at the most competitive price, but simply raises that price. The procurement statute does not cut such a wide swath through state law as to invalidate the reporting and labeling regulations.

In this case the most competitive source for alcoholic beverages are out-of-state distributors whose prices are lower than those charged by North Dakota wholesalers regardless of whether the labeling and reporting requirements are enforced. The North Dakota regulations, which do not restrict the parties from whom the Government may purchase liquor or its ability to engage in competitive bidding, but at worst raise the costs of selling to the military for certain shippers, do not directly conflict with the federal statute.

## V

The DoD regulation restates, in slightly different language,[11] the statutory requirement that distilled spirits be "procured from the most competitive source, price and other factors considered," but it does not purport to carry a greater pre-emptive power than the statutory command itself. It is Congress—not the DoD—that has the power to pre-empt otherwise valid state laws, and there is no language in the relevant statute that either pre-empts state liquor distribution laws or delegates to the DoD the power to pre-empt such state laws.[12]

Nor does the text of the DoD regulation itself purport to pre-empt any state laws. See *California Coastal Comm'n* v. *Granite Rock Co.*, 480 U. S. 572, 583 (1987); *Hillsborough County* v. *Automated Medical Laboratories, Inc.*, 471 U. S., at 717–718. It directs the military to consider various factors in determining "the most advantageous contract, price and other considered factors," but that command cannot be understood to pre-empt state laws that have the incidental effect of raising costs for the military. Indeed, the regulation specifically envisions some regulation by state law, for it provides that the Department "shall cooperate with local [and] state . . . officials . . . to the degree that their duties relate to the provisions of this chapter." The regulation

---

[11] See *supra*, at 427–428. The fact that this regulation was promulgated in 1982 makes it rather clear that it was not intended to address the problem of labeling or reporting regulations or otherwise to enlarge the authority to make out-of-state purchases as permitted by the 1986 statute.

[12] The statute pursuant to which the DoD regulation was promulgated does not even speak to the purchase of liquor by the military. It provides in part:

"The Secretary of Defense is authorized to make such regulations as he may deem to be appropriate governing the sale, consumption, possession of or traffic in beer, wine, or any other intoxicating liquors to or by members of the Armed Forces . . . at or near any camp, station, post, or other place primarily occupied by members of the Armed Forces . . . ." 65 Stat. 88, 50 U. S. C. App. § 473 (1982 ed.).

does admonish that such cooperation should not be construed as an admission that the military is obligated to submit to state control or required to buy from suppliers located within the State or prescribed by the State. The North Dakota regulations, however, do not require the military to submit to state control or to purchase alcoholic beverage from suppliers within the State or prescribed by the State. The DoD regulation has nothing to say about labeling or reporting by out-of-state suppliers.

When the Court is confronted with questions relating to military discipline and military operations, we properly defer to the judgment of those who must lead our Armed Forces in battle. But in questions relating to the allocation of power between the Federal and State Governments on civilian commercial issues, we heed the command of Congress without any special deference to the military's interpretation of that command.

The present record does not establish the precise burdens the reporting and labeling regulations will impose on the Government, but there is no evidence that they will be substantial. The reporting requirement has been in effect since 1978 and there is no evidence that it has caused any supplier to raise its costs or stop supplying the military. Although the labeling regulation has caused a few suppliers either to adjust their prices or to cease direct shipments to the bases, there has been no showing that there are not other suppliers willing to enter the market and there is no indication that the Government has made any attempt to secure other out-of-state suppliers. The cost of the labels is approximately three to five cents if purchased from the state treasurer, and the distillers have the right to print their own labels if they prefer. App. 34. Even in the initial stage of enforcing the requirement for the two bases in North Dakota, various distillers and suppliers have already notified the state treasurer that they intend to comply with the new regulations. *Ibid.*

And, even if its worst predictions are fulfilled, the military will still be the most favored customer in the State.

It is Congress, not this Court, which is best situated to evaluate whether the federal interest in procuring the most inexpensive liquor outweighs the State's legitimate interest in preventing diversion. Congress has already effected a compromise by excluding beer and wine and the States of Hawaii and Alaska from the 1986 statute. It may also decide to prohibit labels entirely or prescribe their use on a nationwide basis. It would be both an unwise and an unwarranted extension of the intergovernmental immunity doctrine for this Court to hold that the burdens associated with the labeling and reporting requirements—no matter how trivial they may prove to be—are sufficient to make them unconstitutional. The judgment of the Court of Appeals is reversed.

*It is so ordered.*

JUSTICE SCALIA, concurring in the judgment.

All agree in this case that state taxes or regulations that discriminate against the Federal Government or those with whom it deals are invalid under the doctrine of intergovernmental immunity. See *ante*, at 435 (opinion of STEVENS, J.); *post*, at 451–452 (opinion of BRENNAN, J.); *Memphis Bank & Trust Co.* v. *Garner*, 459 U. S. 392, 398 (1983). The principal point of contention is whether North Dakota's labeling requirement produces such discrimination. I agree with JUSTICE STEVENS that it does not, because the Federal Government can readily avoid that discrimination against its contractors by purchasing its liquor from in-state distributors, as everyone else in North Dakota must do. I disagree with JUSTICE STEVENS, however, as to *why* the availability of this option saves the regulation.

If I understand JUSTICE STEVENS correctly, the availability of the option suffices, in his view, whether or not North Dakota would have the power to prevent the Federal Government from purchasing liquor directly from out-of-state

suppliers. So long as the Federal Government does not *have* to pay more tax than North Dakota citizens in order to obtain liquor, the principle of governmental immunity is not offended. For this proposition JUSTICE STEVENS relies on *Washington* v. *United States*, 460 U. S. 536 (1983), in which we upheld a state scheme for taxing building materials in which the Federal Government's business partners paid a tax other market participants did not. There the State normally imposed a tax upon the landowner for the purchase of construction materials. Since it could not constitutionally do so where the Federal Government was the landowner, it imposed the tax instead upon the building contractor, though at a lower rate than the tax applicable to landowners. We upheld the contractor tax on the ground that the net result accorded the Federal Government treatment no worse than that received by its private-sector counterparts; at worst, it would have to reimburse its contractors for the tax paid, in which event (because of the lower rate for the contractor tax) it would still be better off than the private landowner. *Id.,* at 542.

As an original matter I am not sure I would have agreed with the approach we took in *Washington,* for reasons of both principle and practicality. As a matter of principle, if (as we recognized in *Washington*) the Federal Government has a constitutional entitlement to its immunity from direct state taxation, then it seems to me the State cannot require it to "pay" for that entitlement by bearing the burden of an indirect tax directed at it alone. And as a matter of practicality, a jurisdictional issue (the jurisdiction to tax) should not turn upon a factor that is, as a general matter, so difficult to calculate as the Federal Government's "net" position. But today's case is in any event distinguishable from *Washington* in that the difficulty of calculation is not only an accurate general prediction but a reality on the facts before us. Unlike in *Washington,* where the relative burdens placed on the Federal Government and its private-sector counterparts were easily

compared (one could simply look at the tax rates), North Dakota's labeling requirement cannot be directly measured against the taxes imposed on other participants in the State's liquor market.   One might, with some difficulty, determine the cost of compliance with the labeling requirement and uphold the regulation if that cost is less than the taxes imposed upon nonfederal purchasers.   But under that approach, the constitutionality of North Dakota's regulation might vary year to year as the cost of compliance (the cost of buying and affixing labels) fluctuates.   I do not think *Washington* compels us to uphold a regulatory requirement uniquely imposed on federal contractors that is so different from the offsetting burden on private market participants as to require difficult and periodic computation of relative burden.

This problem of comparability of burden does not trouble JUSTICE STEVENS because, he says, the rule of *Washington* is satisfied in this case because the Federal Government is given the *option* of purchasing label-free liquor from in-state distributors, and thus (by definition) the *option* of not carrying a higher financial burden than anyone else.   That approach carries *Washington* one step further (though I must admit a logical step further) down the line of analysis that troubled me about the case in the first place.   *Washington* said (erroneously, in my view) that you can impose a discriminatory indirect tax, so long as it is no higher than the general direct tax which the Federal Government has a constitutional right to avoid.   But if economic comparability is the touchstone, reasons JUSTICE STEVENS—that is, if everything is OK so long as the Federal Government pays no more taxes than anyone else—then it should follow that you can impose a discriminatory indirect tax that is even *greater* than the constitutionally avoided direct tax, so long as the Federal Government is given the *option* of paying the direct tax instead. I would not make that extension, however reasonable it may be.   Suffering a discriminatory imposition in the precise amount of the constitutionally avoidable tax is not the same

in kind (though it may well be the same in effect) as suffering a discriminatory imposition in a higher amount with the option of escaping it by paying the constitutionally avoidable tax. If, therefore, in the present case, the State could not compel the Federal Government to purchase its liquor from in-state distributors, then I do not think it could force the Federal Government to choose between paying for a discriminatory labeling requirement and purchasing from in-state suppliers.

I ultimately agree with JUSTICE STEVENS, however, that the existence of the option in the present case saves the discriminatory regulation—but only because the option of buying liquor from in-state distributors (unlike the option of paying a direct tax in *Washington*) is *not* a course of action that the Federal Government has a constitutional right to avoid. The Twenty-first Amendment, which prohibits "the transportation or importation into any State . . . for delivery or use therein of intoxicating liquors, in violation of the laws thereof," is binding on the Federal Government like everyone else, and empowers North Dakota to require that all liquor sold for use in the State be purchased from a licensed in-state wholesaler. Nothing in our Twenty-first Amendment case law forecloses that conclusion. In all but one of the cases in which we have invalidated state restrictions on liquor transactions between the Federal Government and its business partners, the liquor was found not to be for "delivery or use" in the State because its destination was an exclusive federal enclave. See *United States* v. *Mississippi Tax Comm'n*, 412 U. S. 363 (1973); *Collins* v. *Yosemite Park & Curry Co.*, 304 U. S. 518 (1938); cf. *Johnson* v. *Yellow Cab Transit Co.*, 321 U. S. 383 (1944). In the remaining case, *United States* v. *Mississippi Tax Comm'n*, 421 U. S. 599 (1975), we held that the State could not impose a sales tax, the legal incidence of which fell on the Federal Government, on liquor supplied to a federal military base under concurrent state-federal jurisdiction. That decision rested on the con-

clusion that the Twenty-first Amendment had not abolished the Federal Government's traditional immunity from state taxation. *Id.*, at 612–613. I do not believe one must also conclude that the Twenty-first Amendment did not abolish the Federal Government's immunity from state regulation. Federal immunity from state taxation, which has been a bed-rock principle of our federal system since *McCulloch* v. *Maryland,* 4 Wheat. 316 (1819), is at least arguably consistent with the text of the Twenty-first Amendment's prohibition on transportation or importation in violation of state law. Federal immunity from state liquor import regulation is not.

That is not to say, of course, that the State may enact regulations that discriminate against the Federal Government. But for reasons already adverted to, the North Dakota regulations do not do so. In giving the Federal Government a choice between purchasing label-free bottles from in-state wholesalers or purchasing labeled bottles from out-of-state distillers, North Dakota provides an option that no other retailer in the State enjoys. That being so, the labeling requirement for liquor destined for sale or use on nonexclusive federal enclaves does not violate any federal immunity.

For these reasons, I concur in the judgment.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL, JUSTICE BLACKMUN, and JUSTICE KENNEDY join, concurring in the judgment in part and dissenting in part.

I concur in the Court's judgment that North Dakota's reporting requirement is lawful, but cannot join the Court in upholding that State's labeling requirement. I cannot join the plurality because it underestimates the degree to which North Dakota's law interferes with federal operations and derogates the Federal Government's immunity from such interference, which is secured by the Supremacy Clause. I cannot join JUSTICE SCALIA because his approach is at odds with our decision in *United States* v. *Mississippi Tax Comm'n,* 421 U. S. 599 (1975) *(Mississippi Tax Comm'n II).*

## I

The labeling requirement imposed by North Dakota is not a trifling inconvenience necessary to the State's regulatory regime. An importer or distiller supplying the United States military bases in North Dakota must not only purchase or manufacture special labels and affix one to each bottle, it also must segregate and then track those bottles throughout the remainder of its manufacturing and distribution process. The special label requirement throws a wrench into the firm's entire production system. The cost of complying with the regulation, therefore, is far greater than the few pennies per label acknowledged by the plurality. See *ante*, at 428–429. Five of the Government's suppliers have declined to continue shipping to the military bases in North Dakota as a direct result. The five firms are the primary United States distributors for nine popular brands of liquor: Chivas Regal scotch, Johnnie Walker scotch, Tanqueray gin, Canadian Club whiskey, Courvoisier cognac, Jim Beam bourbon, Seagrams 7 Crown whiskey, Smirnoff vodka, and Jose Cuervo tequila. The U. S. importer of Beefeaters gin agreed to continue doing business, but only at a price increase of up to $20.50 per case. The suppliers of these brands potentially still available to fill the military's needs are either companies operating further down the distribution chain than these distillers and importers, who might be willing to undertake the onerous labeling requirement and duly charge the Government for their trouble, or North Dakota's own liquor wholesalers who are exempt from the requirement.

The labeling requirement, furthermore, cannot be considered "necessary" to the State's liquor regulatory regime by any definition of the term. The State could achieve the same result in its effort to "prevent the unlawful diversion of liquor into [its] regulated intrastate markets," *ante*, at 431, by instead requiring special labels on liquor shipped to in-state

wholesalers. Such labels would accomplish precisely the same goal—providing a means for state police to distinguish legal bottles from illegal ones—without interfering with federal operations. The State is also free to enforce its reporting requirement and take any other action that does not interfere with federal activities, including negotiating a mutual enforcement program with the military, which is itself governed by a regulation prohibiting the kind of diversion that the State seeks to control. See DoD Directive 1015.3-R, ch. 4(F)(3) (May 1982).[1]

That North Dakota's declared purpose for implementing the regulation is to discourage and police unlawful diversion of liquor into its domestic market does not prevent this Court from ruling on its constitutionality. To be sure, this Court has twice said that the States retain police power to regulate shipments of liquor through their territory "insofar as necessary to prevent" unlawful diversion in the absence of conflicting federal regulation. *United States* v. *Mississippi Tax Comm'n,* 412 U. S. 363, 377 (1973) *(Mississippi Tax Comm'n I);* see also *Hostetter* v. *Idlewild Bon Voyage Liquor Corp.,* 377 U. S. 324, 333–334 (1964). Such statements were indications that this Court believed that States are not rendered utterly powerless in this respect by the dormant Commerce Clause. We have never held, however, that any regulation with this avowed purpose is insulated from review under the federal immunity doctrine or any other constitutional ground, including the dormant Commerce Clause. Nor have we ever upheld such a regulation, or any state regulation of liquor that clashed with some federal law or operation, on the basis

---

[1] The regulation provides:

"Diversion. Packaged alcoholic beverage sales outlets are operated solely for the benefit of authorized purchasers. Members of the Uniformed Services and other authorized purchasers shall not sell, exchange, or otherwise divert packaged alcoholic beverages to unauthorized personnel, or for purposes which violate federal, state, or local laws, or Status of Forces agreements."

of a "presumption of validity." Cf. *ante*, at 433. Indeed, our previous, limited statements—that States are not prevented by the Commerce Clause from regulating shipments of liquor through their territory where necessary to prevent diversion—recognized that the regulations must be consistent with other constitutional requirements. See *Mississippi Tax Comm'n I, supra*, at 377 (recognizing such state power only "in the absence of conflicting federal regulation"). Since the States' power is limited by the doctrine of federal pre-emption, which flows from the Supremacy Clause, then that power must also be limited by the doctrine of federal immunity, which also flows from the Supremacy Clause.[2]

## II

The plurality characterizes the doctrine of federal immunity as invalidating state laws only if they regulate the Federal Government directly or discriminate against the Government or those with whom it deals. See *ante*, at 435. As the plurality recognizes, "a regulation imposed on one who deals with the Government has as much potential to obstruct governmental functions as a regulation imposed on the Government itself." *Ante*, at 438. But contrary to the plurality's view, the rule to be distilled from our prior cases is that those dealing with the Federal Government enjoy immunity from

---

[2] The principle of federal immunity from state tax and other regulation was first discerned in *McCulloch* v. *Maryland*, 4 Wheat. 316, 436 (1819) ("The Court has bestowed on this subject its most deliberate consideration. The result is a conviction that the states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government. This is, we think, the unavoidable consequence of that supremacy which the constitution has declared") (invalidating a state tax that fell solely on notes issued by the Bank of the United States). Without such immunity, Chief Justice Marshall reasoned, any State held the power to defeat federal operations because "the power to tax involves the power to destroy," *id.*, at 431, and the Federal Government, unlike the State's citizens, has no voice in the state legislature with which to guard against abuse. *Id.*, at 428.

state control not only when a state law discriminates but also when a state law actually and substantially interferes with specific federal programs. See *United States* v. *New Mexico*, 455 U. S. 720, 735, n. 11 (1982) ("It remains true, of course, that state taxes are constitutionally invalid if they discriminate against the Federal Government, or substantially interfere with its activities"). Cf. *James* v. *Dravo Contracting Co.*, 302 U. S. 134, 161 (1937) (permitting application of a general state tax to federal contractors on the ground that it did not discriminate against them or "interfere in any substantial way with the performance of federal functions"). North Dakota's labeling regulation violates the Supremacy Clause under both standards. It substantially obstructs federal operations, and it discriminates against the Federal Government and its chosen business partners.

## A

The plurality recognizes that we have consistently invalidated nondiscriminatory state regulations that interfere with affirmative federal policies, including those governing procurement, but designates these cases as resting on principles of pre-emption. See *ante*, at 435, and 435–436, n. 7. This characterization is not only at odds with the reasoning in the opinions themselves but suggests a rigid demarcation between the two Supremacy Clause doctrines of federal immunity and pre-emption which is not present in our cases. Whether a state regulation interferes with federal objectives is, of course, a central inquiry in our traditional pre-emption analysis. But when we have evaluated the validity of an obligation imposed by a State on the Federal Government and its business partners, we have justly considered whether the obligation interferes with federal operations as part of our federal immunity analysis.

In *Leslie Miller, Inc.* v. *Arkansas*, 352 U. S. 187 (1956), for example, we held that building contractors employed by the Federal Government were immune from a neutral Arkan-

sas regulation requiring contractors to obtain a state license, because the regulation would give the State "a virtual power of review over the federal determination of 'responsibility' and would thus frustrate the expressed federal policy of selecting the lowest responsible bidder." *Id.*, at 190. We found the following rationale applicable:

> "'It seems to us that the immunity of the instruments of the United States from state control in the performance of their duties extends to a requirement that they desist from performance until they satisfy a state officer upon examination that they are competent for a necessary part of them and pay a fee for permission to go on. Such a requirement does not merely touch the Government servants remotely by a general rule of conduct; it lays hold of them in their specific attempt to obey orders . . . .'" *Ibid.* (quoting *Johnson* v. *Maryland*, 254 U. S. 51, 57 (1920)).

The plurality's assertion that *Leslie Miller, Inc.*, was not decided on immunity grounds, see *ante*, at 436, n. 7, is inconsistent with that opinion's own analysis.

In *Public Utilities Comm'n of California* v. *United States*, 355 U. S. 534 (1958), we found unconstitutional a state provision requiring common carriers to receive state approval before offering free or reduced rate transportation to the United States. We distinguished our cases sustaining nondiscriminatory state taxes and found the regulation unconstitutional because it would have interfered with the Government's policy of negotiating rates. *Id.*, at 543–545. We explained that a decision in favor of California would have interfered with the activities of federal procurement officials and would have required the Federal Government either to pay higher rates or to conduct separate negotiations with the regulatory divisions of, potentially, each of the then-48 States. *Id.*, at 545–546.

Contrary to the plurality's contention, *ante*, at 435–436, n. 7, we concluded that the regulation was unconstitutional

not under pre-emption doctrine but because it "place[d] a prohibition on the Federal Government" as significant as the licensing requirements invalidated in *Leslie Miller, Inc.* v. *Arkansas, supra,* and *Johnson* v. *Maryland, supra,* both decided on federal immunity grounds. See *supra,* at 452–453. Moreover, we relied on the following passage from *McCulloch* v. *Maryland,* 4 Wheat. 316, 427 (1819), which elucidates the doctrine of federal immunity:

> "It is of the very essence of supremacy to remove all obstacles to [federal] action within its own sphere, and so to modify every power vested in subordinate governments, as to exempt its own operations from their own influence."

Furthermore, the Court's rationale in *Public Utilities Comm'n*—that a state regulation which obstructs federal operations is prohibited under the federal immunity doctrine—is not inconsistent with our decisions sustaining state taxes solely on the ground that they do not discriminate against the Government or its business partners. Indeed, we sustained such a nondiscriminatory state tax on federal contractors the same day that we decided *Public Utilities Comm'n.* See *United States* v. *City of Detroit,* 355 U. S. 466, 472 (1958) (upholding the application of a state tax to lessees of federal property).[3]

---

[3] The plurality relies on *South Carolina* v. *Baker,* 485 U. S. 505, 523 (1988), and *United States* v. *County of Fresno,* 429 U. S. 452, 460 (1977), for the proposition that a state regulation is invalid under the immunity doctrine *only* if it directly regulates the United States or is discriminatory. See *ante,* at 434–435. This extrapolates too much from the *City of Detroit* line of cases and ignores the *Public Utilities Comm'n of California* line. What *South Carolina* v. *Baker* and *County of Fresno* actually say is that a *state tax* is not invalid unless it is directly laid on the Federal Government or discriminatory. Both cases cite, in support of this proposition, *City of Detroit,* which itself cites the same rule: "[A] tax may be invalid even though it does not fall directly on the United States if it operates so as to discriminate against the Government or those with whom it deals." 355 U. S., at 473. The Court's decision the same day, in *Public Utilities*

In the companion cases of *United States* v. *Georgia Public Service Comm'n*, 371 U. S. 285 (1963), and *Paul* v. *United States*, 371 U. S. 245 (1963), we invalidated two other neutral

*Comm'n of California*, 355 U. S., at 544, that California's regulation of public carriers.in their dealings with the Federal Government violated the federal immunity doctrine underscores that the language in *City of Detroit* and other tax cases was never intended to delineate the full scope of the doctrine. The California regulation could not have been characterized as discriminatory. Carriers were permitted to contract with the United States on the same terms as with any other customer; they were just required to obtain state permission before giving the Government special treatment. 355 U. S., at 537.

To be sure, state taxes and regulations are subject to the same restrictions under the federal immunity doctrine, see *Mayo* v. *United States*, 319 U. S. 441, 445 (1943). Regulations, however, present a wider range of possibilities for interference with federal activities than do taxes. The tax in *City of Detroit* did not interfere with the Federal Government's ability to lease property and therefore interference was not an issue that required discussion. In contrast, the regulation in *Public Utilities Comm'n of California* did interfere with the Federal Government's ability to choose "'the least costly means of transportation . . . which will meet military requirements,'" 355 U. S., at 542, and the issue was discussed.

As the Court said in *Graves* v. *New York ex rel. O'Keefe*, 306 U. S. 466, 484 (1939), a nondiscriminatory tax "could not be assumed to obstruct the function which [a government entity] had undertaken to perform." This is because "the purpose of the immunity was not to confer benefits on the employees [of the Federal Government] by relieving them from contributing their share of the financial support of the other government, whose benefits they enjoy, or to give an advantage to a government by enabling it to engage employees at salaries lower than those paid for like services by other employers, public or private, but to prevent undue interference with the one government by imposing on it the tax burdens of the other." *Id.*, at 483–484 (footnote omitted). Therefore, we have upheld nondiscriminatory taxes imposed on those with whom the Federal Government deals because "'[i]t seems unreasonable to treat the absence of an exemption from taxes [for those with whom the Government deals] as a burden upon the normal exercise of a governmental function.'" See *California Bd. of Equalization* v. *Sierra Summit, Inc.*, 490 U. S. 844, 849, n. 4 (1989) (quoting favorably Judge Augustus Hand's explanation from *In re Leavy*, 85 F. 2d 25, 27 (CA2 1936)). And we have found in specific cases involving "a state tax that is general and nondiscriminatory" that "'[t]he tax does not place

state regulations because they interfered with the Federal Government's chosen mode of procurement.[4]   In *Georgia Public Service Comm'n, supra,* at 292, we held that Georgia could not revoke the operating certificates of any moving

a financial burden upon the United States; nor will it . . . render the [federal official's] task more difficult or cumbersome.'" *California Board of Equalization, supra,* at 850, n. 6 (quoting Wurzel, Taxation During Bankruptcy Liquidation, 55 Harv. L. Rev. 1141, 1166–1169 (1942)).   However, the fact that nondiscriminatory taxes have not been found to obstruct federal operations does not mean that nondiscriminatory regulations can be assumed to be equally harmless, as our cases make evident.

[4] These cases as well were decided on immunity grounds.   The Court characterized both cases, decided the same day, as presenting the question "whether or not the state regulatory scheme burdened the exercise by the United States of its constitutional powers to maintain the Armed Services."   *Paul,* 371 U. S., at 250.   In addition, in *Paul,* the Court explained its invalidation of California's milk regulations, even as applied to purchases of milk for resale at federal commissaries, as follows: "These commissaries are 'arms of the Government deemed by it essential for the performance of governmental functions,' and 'partake of whatever immunities' the Armed Services 'may have under the Constitution and federal statutes.'"   *Id.,* at 261 (citation omitted).   In *Georgia Public Service Comm'n,* the Court relied on its earlier decision in *Public Utilities Comm'n of California, supra,* which decision was grounded in the *McCulloch* v. *Maryland* federal immunity doctrine.   See 371 U. S., at 293.

Moreover, *Paul* recharacterized the decision in *Penn Dairies, Inc.* v. *Milk Control Comm'n of California,* 318 U. S. 261 (1943), which the plurality cites for the proposition that States may permissibly obstruct federal operations if they do so by means of neutral laws, see *ante,* at 435.   In the *Paul* Court's view, *Penn Dairies* stood for the unremarkable proposition that when federal law expressly permits the Government to purchase supplies on the open market "'when the price [of such supplies] is fixed by federal, state, municipal or other competent legal authority'" and expressly manifested a "'hands off' policy respecting minimum price laws of the States," state minimum price laws may constitutionally be enforced against the Government's suppliers.   371 U. S., at 254–255.   Revealingly, the plurality musters no support other than the no-longer-apposite *Penn Dairies* for its assertion that price control regulations aimed at government suppliers have repeatedly been upheld against constitutional challenge.   See *ante,* at 437.

company for undertaking a mass intrastate shipment of household goods for the Federal Government at volume discount rates, although such rates violated Georgia law, because federal regulations required Government officers to secure the " 'lowest over-all cost' " in purchasing transportation "through competitive bidding or negotiation." Similarly, in *Paul* v. *United States, supra,* we held that California minimum wholesale milk prices could not be enforced against sellers supplying United States military bases where federal regulations mandated "full and free competition" and selection of the "lowest responsible bidder" because the "California policy defeats the command to federal officers to procure supplies at the lowest cost to the United States." *Id.,* at 252, 253.

North Dakota's labeling regulation would interfere with the military's ability to comply with affirmative federal policy in the same way as the regulations we invalidated in *Public Utilities Comm'n of California* v. *United States,* 355 U. S. 534 (1958); *United States* v. *Georgia Public Service Comm'n, supra,* and *Paul* v. *United States, supra.* As in those cases, the state regulation threatens to scuttle the Federal Government's express determination to secure products and services in the most competitive manner possible. Federal law requires military officials to purchase distilled spirits "from the most competitive source, price and other factors considered." 10 U. S. C. § 2488(a). In enacting this standard, Congress made a deliberate choice to permit, and generally encourage, the military to buy liquor for its bases outside the States in which they are located. The "competitive source" provision replaced an earlier statute requiring bases to purchase all alcoholic beverages in state. See Pub. L. 99–190, § 8099, 99 Stat. 1219. The statute's legislative history shows that Congress determined that the military should be free to purchase distilled spirits out of state from the most competitive source,

both to save money and to generate more funding for morale and welfare activities.[5]

For liquor, the most competitive sources are distillers and importers — companies operating at the top of the national distribution chain. It is not only plausible that such companies would find it more trouble than it was worth to comply with North Dakota's labeling requirement, five companies have already refused to fill orders for the North Dakota bases. At least one other firm has been willing to fill orders only at a substantially increased price. The regulation would force the military to lose some of the advantages of a highly competitive nationwide market, either because it would be subjected to special surcharges by out-of-state suppliers or forced to pay high in-state prices — or some combination of these. Moreover, the difficulties presented by North Dakota's labeling requirement would increase exponentially if additional States adopt equivalent rules, a consideration we found dispositive in *Public Utilities Comm'n of California, supra,* at 545–546. See also *Memphis Bank & Trust Co.* v. *Garner,* 459 U. S. 392, 398, n. 8 (1983) (rejecting the argu-

---

[5] The Senate Armed Services Committee Report explained that it "included a provision mandating that purchases of such alcoholic beverages for resale be made in the most efficient and economic manner, without regard to the location of the source of the beverages, except as that location may affect cost . . . [because] the committee believes that procurement of alcoholic beverage[s] for resale should be subjected to the same favorable effects of competition as is useful in the procurement of other goods and services. Additionally, the committee does not believe it appropriate to impose upon the Department, or the morale and welfare activities of the Department, a requirement that will result in additional costs of tens of millions of dollars, caused by the imposition of indirect State taxation [o]n the Federal government and the lack of competition." S. Rep. No. 99–331, p. 283 (1986).

The Senate supported deletion of the in-state purchasing requirement for all alcoholic beverages, but the House prevailed in excepting beer and wine, on the ground that the military's overall alcohol procurement costs would not be unduly affected. H. R. Rep. No. 99–718, pp. 183–184 (1986); H. R. Conf. Rep. No. 99–1001, pp. 39, 464 (1986).

ment that a Tennessee bank tax that discriminated against federal obligations might be *de minimis* because if every State enacted comparable provisions, the Federal Government would sustain significantly higher borrowing costs).

The regulation also intrudes on federal procurement in a manner not unlike the licensing requirement we found unacceptable in *Leslie Miller, Inc.* v. *Arkansas*, 352 U. S. 187 (1956). Just as Arkansas' licensing regulation would have given that State a say as to which building contractor the Federal Government could hire, the North Dakota labeling requirement—by acting as a deterrent to contracting with the Federal Government—would prevent the Federal Government from making an unfettered choice among liquor suppliers. The military cannot effectively comply with Congress' command to purchase from "the most competitive source" when a number of the most competitive sources—distillers and importers—are driven out of the market by the State's regulation. Thus, North Dakota's labeling regulation "'does not merely touch the Government servants remotely by a general rule of conduct; it lays hold of them in their specific attempt to obey orders.'" *Leslie Miller, Inc.* v. *Arkansas, supra,* at 190 (quoting and applying *Johnson* v. *Maryland*, 254 U. S., at 57). Federal military procurement policies for distilled spirits, therefore, would be obstructed and, under this Court's federal immunity doctrine, the regulation should fall.[6]

---

[6] Contrary to the plurality's assertion, I would find the labeling regulation invalid not because it "in any way touched federal activity," *ante,* at 437, n. 8, but because it obstructs an affirmative federal procurement policy specified by Congress (and also because it discriminates against the Federal Government and its suppliers). The plurality suggests that my recognition of this aspect of federal immunity doctrine will lead to a parade of horribles: Every state regulation will be potentially subject to challenge. *Ibid.* But this particular parade has long been braved by our court system, not only under the doctrine of federal immunity but also under the much broader doctrine of pre-emption. See *Hines* v. *Davidowitz*, 312 U. S. 52, 67 (1941) (explaining that state law is pre-empted whenever it

## B

Even if I agreed with the plurality that our federal immunity doctrine proscribes only those state laws that discriminate against the Federal Government or its business partners, however, I would still find North Dakota's labeling regulation invalid. North Dakota's labeling regulation plainly discriminates against the distillers and importers who supply the Federal Government because it is applicable only to "liquor destined for delivery to a federal enclave in North Dakota." N. D. Admin. Code § 84–02–01–05(7) (1986). A state control that makes the Federal Government or those with whom it deals worse off than "their counterparts in the private sector" is discriminatory. *Washington* v. *United States*, 460 U. S. 536, 543 (1983). "The appropriate question is whether [someone] who is considering working for the Federal Government is faced with a cost he would not have to bear if he were to do the same work for a private party." *Id.*, at 541, n. 4. An importer or distiller for a particular brand has two kinds of potential customers in North Dakota: military bases and North Dakota wholesalers. For any liquor it sells to the military, it is required to buy or manufacture and affix special labels. Then it must monitor separately the handful of cases destined for the two military bases in North Dakota during the rest of the company's manufacturing and shipping process, in order to ensure that only specially labeled bottles are sent to Grand Forks and Minot Air Force Bases. However, the same distiller could sell its product to a North Dakota liquor wholesaler without affixing

---

"stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"); *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947) (explaining that state law is pre-empted where it produces a result inconsistent with the objective of a federal statute). A judiciary capable of discerning when federal objectives are *frustrated* under pre-emption doctrine and when interstate commerce is *burdened* under dormant Commerce Clause doctrine also may be relied on to determine when federal operations are *obstructed* under federal immunity doctrine.

special labels or reducing its economies of scale.[7]  *Washington* v. *United States*, therefore, mandates a finding that the labeling requirement discriminates against those who deal with the Federal Government.[8]

---

[7] Cf. *California Board of Equalization* v. *Sierra Summit, Inc.*, 490 U. S., at 849 (upholding the application of a use tax to a bankruptcy sale because " '[t]he purchaser at the judicial sale was only required to pay the same tax he would have been bound to pay if he had purchased from anyone else' ") (quoting and applying *In re Leavy*, 85 F. 2d, at 27); *United States* v. *County of Fresno*, 429 U. S., at 465 (upholding a state tax on federal lessees because "appellants who rent from the Forest Service are no worse off under California tax laws than those who work for private employers and rent houses in the private sector").

[8] In *Washington* v. *United States*, we also placed reliance on the fact that the state tax at issue was imposed at the same rate on every retail sale in the State and that "virtually every citizen is affected by the tax in the same way."  460 U. S., at 545–546.  Therefore, we concluded, there was a "political check" because the "state tax falls on a significant group of state citizens who can be counted upon to use their votes to keep the State from raising the tax excessively, and thus placing an unfair burden on the Federal Government."  *Id.*, at 545.  As we explained in *United States* v. *County of Fresno, supra,* at 463, n. 11: "A tax on the income of federal employees, or a tax on the possessory interest of federal employees in Government houses, if imposed only on them, could be escalated by a State so as to destroy the federal function performed by them either by making the Federal Government unable to hire anyone or by causing the Federal Government to pay prohibitively high salaries.  This danger would never arise, however, if the tax is also imposed on the income and property interests of all other residents and voters of the State."  A "political check" "has been thought necessary because the United States does not have a direct voice in the state legislatures."  *Washington* v. *United States*, 460 U. S., at 545.

This Court has never upheld a state tax or regulation triggered solely by a federal transaction where the Court did not also find that the tax or regulation was part of a larger scheme that affected a politically significant number of citizens of the State.  See *ibid.; County of Fresno, supra,* at 465 (upholding a special tax on federal employees because the Court found that an equivalent tax was imposed on other state residents).  In contrast, there is no one represented in the North Dakota State Legislature to provide a political check on that State's liquor labeling regulation because it affects solely out-of-state companies and the Federal Government.

The plurality attempts to reach the opposite result by arguing that we need to view the state regulatory scheme in its entirety to determine whether the Federal Government is better or worse off on the whole, in the endeavor affected by a seemingly discriminatory State law, than those given preferred treatment by that law. See *ante*, at 435. This Court has never subscribed to such an approach. To the contrary, *Washington* v. *United States, supra,* which the plurality cites for this proposition, holds merely that where "[t]he tax on federal contractors is part of the same structure, and imposed at the same rate, as the tax on the transactions of private landowners and contractors" it is nondiscriminatory. *Id.,* at 545. In so deciding, the Court specifically cautioned that "[a] different situation would be presented if a State imposed a sales tax on contractors who work for the Federal Government, and an entirely different kind of tax, such as a head tax or a payroll tax, on every other business." *Id.,* at 546, n. 11.

In *Washington* v. *United States,* we found that the state building tax on federal contractors and the slightly larger building tax on private landowners placed no larger an economic burden on federal contractors than on private ones. The Court concluded that although the legal incidence of the taxes was different — one fell on the landowners directly and the other on the federal contractors — the tax did not discriminate against federal contractors or the Federal Government because each tax would be reflected in the fees the contractors could charge. As a result, the Court concluded that the tax on the federal contractors cost them no more than the equivalent tax borne indirectly by their private counterparts, and very likely cost them less. *Id.,* at 541–542.

The conclusion to be drawn from *Washington* v. *United States* is that North Dakota would not violate the federal immunity doctrine by placing a labeling requirement on the out-of-state distillers who supply the military bases within the State if it also imposed the same labeling requirement di-

rectly on the in-state wholesalers for all liquor purchased out of state. The plurality's view, that the labeling regulation is not discriminatory unless the entire North Dakota liquor regulatory system places the Federal Government at a disadvantage competing with in-state wholesalers or retailers, is a different proposition altogether. See also JUSTICE SCALIA's opinion, *ante*, at 448.

The plurality argues that, in this case, the State compensates the Federal Government for the discriminatory labeling requirement by prohibiting private retailers from buying liquor from out-of-state suppliers and that therefore the Government is favored over other North Dakota retailers. There are core difficulties with this comparison. Since the regulation is imposed on out-of-state suppliers, the regulation would affect the Federal Government when it purchases liquor from those suppliers. The private parties within the State who are comparable, therefore, are North Dakota wholesalers who purchase liquor outside the State and resell it to the distributors and retailers farther down the distribution chain within the State—not North Dakota retailers.

The appropriate comparison between the Federal Government and its actual private counterpart—a North Dakota wholesaler—cannot be made with confidence. The regulations that the plurality presumes are economically equivalent are so entirely unlike that it is wholly speculative that the impositions on in-state wholesalers are comparable to the imposition on the Federal Government and its suppliers. Such a comparison requires us to determine whether there is greater profit in buying from out-of-state distillers at a price that does not reflect the labeling requirement while reaping only the wholesaler's mark-up, or whether it is more lucrative to buy from whomever will sell specially labeled liquor at whatever price this costs but to reap the margin on retail sales. Even if the comparison could be made reliably at some set moment, there is no reason to expect the result to

be the same every year; it would vary depending on the business conditions affecting each half of the equation.[9]

As is obvious, there is simply no assurance that North Dakota is actually regulating evenhandedly when it taxes and licenses some and requires special product labels for others. The labeling regulation is not part of a larger scheme where like obligations are imposed, albeit at different stages of commerce, on federal and nonfederal suppliers. It is that "different situation," that we identified in *Washington* v. *United States*, where unlike and hard to compare obligations are imposed. Contrary to the plurality's assertion, *ante* at 438, *Washington* v. *United States* does not require or even support a finding that the regulation is constitutional. To the contrary, when a State imposes an obligation, triggered solely by a federal transaction, that cannot be found with confidence to place the Federal Government and its contractors in as good a position as, or better than, its counterparts in the pri-

---

[9] Even if the plurality were correct that the appropriate comparison were to a North Dakota retailer, so long as the Government continues to purchase liquor out of state, its relative position turns on another apples-and-oranges comparison. Is it economically advantageous to reimburse out-of-state distillers for the cost of compliance with the State's labeling requirement but to avoid paying a wholesaler's markup? Or is paying the wholesaler's markup less expensive, when the base price to the wholesaler need not reflect the cost of compliance?

It is true that if the Government simply purchased liquor from North Dakota's own wholesalers—at an estimated increased cost of $200,000 to $250,000 in the next year—it would avoid the labeling requirement and thereby occupy the same position as North Dakota retailers. But the regulation cannot be claimed to be nondiscriminatory on the ground that the Government has the option to do what the State may not force it to do directly—*i. e.*, purchase liquor inside the State. Even the plurality concedes that North Dakota may not permissibly restrict the Government from purchasing liquor out of state. See *ante*, at 440. Thus, to be considered nondiscriminatory the North Dakota regulatory scheme, even under the plurality's approach, must place the Federal Government and its suppliers in as good a position as their North Dakota counterparts *even if the Government chooses not to purchase liquor in state.*

vate sector, our cases require a finding that the regulation is wholly impermissible.[10]

## III

JUSTICE SCALIA, alone, agrees with appellants that § 2 of the Twenty-first Amendment[11] saves the labeling regulation because the regulation governs the importation of liquor into the State. I believe, however, that the question presented in this case, whether the Twenty-first Amendment empowers States to regulate liquor shipments to military bases over which the Federal Government and a State share concurrent jurisdiction, is one we have addressed before and answered in the negative. In *Mississippi Tax Comm'n II*, 421 U. S. 599 (1975),[12] we explained:

---

[10] By contrast, North Dakota's reporting requirement does not discriminate against either the military bases or the distillers and importers who supply them, nor does it obstruct federal operations. By its terms, it is imposed on "[a]ll persons sending or bringing liquor into North Dakota." N. D. Admin. Code § 84–02–01–05(1) (1986). The regulation requires all out-of-state suppliers to make monthly reports to the State whether they sell to the Federal Government or to private firms in North Dakota. The military's suppliers are in no different a position vis-à-vis the reporting requirement than they would be if they were supplying the private sector. The military is in no different a position than any private firm importing liquor into North Dakota. Nor was there any evidence introduced showing that the regulation interferes with the military's ability to comply with the affirmative federal policy of purchasing liquor in bulk from the most competitive sources in the country. The reporting requirement has been in effect since 1978, and, therefore, none of the suppliers' refusals to deal or increase of prices announced in 1986 can be attributed plausibly to this requirement alone.

[11] Section 2 of the Twenty-first Amendment provides:

"The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited."

[12] The two *Mississippi Tax Comm'n* cases required us to decide whether Mississippi constitutionally could require out-of-state liquor suppliers to collect a tax from the Federal Government on liquor shipped to four military bases within the State's boundaries. The Government had exclusive jurisdiction over two of the bases and concurrent jurisdiction over the

" '[T]he Twenty-first Amendment confers no power on a State to regulate—whether by licensing, taxation, or otherwise—the importation of distilled spirits into territory over which the United States exercises exclusive jurisdiction.' " *Id.*, at 613, quoting *Mississippi Tax Comm'n I*, 412 U. S., at 375.

"We reach the same conclusion as to the concurrent jurisdiction bases to which Art. I, § 8, cl. 17, does not apply: 'Nothing in the language of the [Twenty-first] Amendment nor in its history leads to [the] extraordinary conclusion' that the Amendment abolished federal immunity with respect to taxes on sales of liquor to the military on bases where the United States and Mississippi exercise concurrent jurisdiction. . . .

" . . . [I]t is a 'patently bizarre' and 'extraordinary conclusion' to suggest that the Twenty-first Amendment abolished federal immunity as respects taxes on sales to the bases where the United States and Mississippi exercise concurrent jurisdiction, and 'now that the claim for the first time is squarely presented, we expressly reject it.' " *Mississippi Tax Comm'n II*, *supra*, at 613–614 (quoting *Department of Revenue* v. *James B. Beam Distilling Co.*, 377 U. S. 341, 345–346 (1964), and *Hostetter* v. *Idlewild Bon Voyage Liquor Corp.*, 377 U. S., at 332).

Appellants argue that *Mississippi Tax Comm'n II* is applicable only to taxes or other regulations imposed directly on the United States, because the legal incidence of the tax at issue in that case fell on the military, not its supplier. See 421 U. S., at 609. Appellants' reliance on this distinction, however, is misplaced. To be sure, a tax or regulation imposed directly on the Federal Government is invariably invalid under the doctrine of federal immunity whereas a tax

other two. In *Mississippi Tax Comm'n I*, 412 U. S. 363 (1973), we decided in favor of the United States as to the two exclusive jurisdiction enclaves. In *Mississippi Tax Comm'n II*, we decided in favor of the United States as to the two concurrent jurisdiction enclaves.

or regulation imposed on those who deal with the Government is invalid only when it actually obstructs or discriminates against federal activity. But the labeling regulation at issue here and the tax at issue in *Mississippi Tax Comm'n II, supra,* violate the doctrine of federal immunity for precisely the same reason: They burden the Federal Government in its conduct of governmental operations. A state regulation that obstructs federal activity is invalid, no matter whom it regulates. To the extent that appellants assume that there are two doctrines of federal immunity—one that protects the Government from direct taxation or regulation and one that protects the Government from the indirect effects of taxes or regulations imposed on those with whom it deals—appellants misconstrue the law.

JUSTICE SCALIA argues that *Mississippi Tax Comm'n II* holds only that the Twenty-first Amendment did not override the Government's immunity from state taxation but did not reach the question whether the Amendment also overrode federal immunity from state regulation. See *ante,* at 447–448. I agree that the Court had only a state tax question before it in that decision, but I do not agree that the Court intended to leave the question of state regulation open. See *Mississippi Tax Comm'n II, supra,* at 613 (concluding that its decision that States have no power to *regulate* the importation of liquor into exclusive jurisdiction federal enclaves is also applicable to concurrent jurisdiction enclaves).

JUSTICE SCALIA's argument raises two separate questions. First, how do we separate those state liquor importation laws that the Twenty-first Amendment permits to override federal laws and other constitutional prohibitions from those laws it does not? Second, how do we determine whether liquor is being imported into North Dakota or into a federal island within the boundaries of the State?

The first is perhaps the more difficult question. It is clear from our decisions that the power of States over liquor trans-

actions is not plenary,[13] even when the State is attempting to regulate liquor importation.[14] To the extent that JUSTICE SCALIA concedes that *Mississippi Tax Comm'n II* is decided correctly, *ante*, at 447–448, his assumption that concurrent jurisdiction federal enclaves are within the State for Twenty-first Amendment purposes requires him to concede that under certain circumstances the "transportation or importation" of liquor into a State "in violation of the laws" of the State in which the enclave is located is *not* prohibited by the Twenty-first Amendment. This is true because we decided that out-of-state importers and distillers could ship liquor to military bases without collecting and remitting the use tax required by Mississippi law. Thus, JUSTICE SCALIA's approach of drawing a line between taxes and regulations, while consistent with some of our cases, is inconsistent with others such as

[13] See, *e. g.*, *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S. 263 (1984) (invalidating a Hawaiian liquor tax because it discriminated against interstate commerce); *Capital Cities Cable, Inc.* v. *Crisp*, 467 U. S. 691 (1984) (invalidating an Oklahoma prohibition of wine advertisements on cable television broadcasts to households within its jurisdiction); *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.*, 445 U. S. 97 (1980) (deciding that California lacked the power to sanction horizontal price fixing for wine sold within its borders); *Craig* v. *Boren*, 429 U. S. 190 (1976) (striking down, under the Equal Protection Clause, a state law setting different drinking ages for men and women); *Hostetter* v. *Idlewild Bon Voyage Liquor Corp.*, 377 U. S. 324 (1964) (holding that New York lacked power to tax or regulate liquor sold at an airport under state jurisdiction but under Federal Bureau of Customs supervision and intended for use outside the state).

[14] See, *e. g.*, *Healy* v. *Beer Institute, Inc.*, 491 U. S. 324 (1989) (invalidating a Connecticut law that required out-of-state shippers of beer to affirm that their prices to Connecticut were no higher than the prices charged in bordering States on the ground that the regulation gave Connecticut a prohibited power over commerce outside its borders); *Department of Revenue* v. *James B. Beam Distilling Co.*, 377 U. S. 341 (1964) (striking down Kentucky's import tax on scotch under the Export-Import Clause).

*Healy* v. *Beer Institute, Inc.*, 491 U. S. 324 (1989).   See n. 13, *supra*.[15]

There is no need, however, to suggest a resolution as to the exact powers of a State to regulate the importation of liquor into its own territory in this case, because the second question raised by JUSTICE SCALIA's approach is dispositive here. I continue to agree with the Court's position in *Mississippi Tax Comm'n II* that concurrent jurisdiction federal enclaves, like exclusive jurisdiction federal enclaves,[16] are not within a "State" for purposes of the Twenty-first Amendment.   421 U. S., at 613.

In addition, North Dakota appears to have ceded all of its power concerning the two federal enclaves within its boundaries, and to enjoy concurrent jurisdiction only through the grace of the United States Air Force.   As noted by the plurality, see *ante*, at 429, n. 2, the parties offer no details concerning the terms of the concurrent jurisdiction on these two bases.   But the public record fills in some quite relevant data.   North Dakota has long ceded by statute to the Federal Government full jurisdiction over any tract of land that may be acquired by the Government for use as a military post (retaining only the power to serve process within).   See

---

[15] To the extent that the Twenty-first Amendment was intended to permit States to prohibit liquor altogether, it is arguable that even federal immunity might not permit the Federal Government to import liquor into a completely dry State to sell at a federal post office or to serve at a cocktail party in a federal court building.   But if the Court, as JUSTICE SCALIA urges, may draw a line between regulations and taxes, which are in fact just one form of regulation, the Court might even more plausibly draw a line between regulations which govern whether liquor may be imported into a State's territory under any circumstances and those which govern merely the circumstances under which liquor may be imported.

[16] See *Collins* v. *Yosemite Park & Curry Co.*, 304 U. S. 518 (1938), in which this Court found unconstitutional the application of California's liquor taxes and regulations to private concessionaires operating hotels, camps, and stores in Yosemite National Park on the ground that the park was an exclusive federal enclave.

N. D. Cent. Code § 54–01–08 (1989). Thus, the State ceded its jurisdiction over the Air Force bases long since.[17] Moreover, North Dakota defines its own jurisdiction as extending to all places within its boundaries *except*, where jurisdiction has been or is ceded to the United States, the State's jurisdiction is "qualified by the terms of such cession or the laws under which such purchase or condemnation has been or may be made." See N. D. Cent. Code § 54–01–06 (1989). Since 1970, Congress has provided that the branches of the armed services could retrocede some or all of the United States' jurisdiction over any property administered by them if exclusive jurisdiction is considered unnecessary. See 10 U. S. C. § 2683. North Dakota's laws permit the Governor to consent to any retrocession of jurisdiction offered. See N. D. Cent. Code § 54–01–09.3 (1989).

Contrary to the plurality's suggestion, see *ante*, at 429, n. 2, we have never held that "concurrent jurisdiction" always means that the State and the Federal Government each have plenary authority over the territory in question. To the contrary, each decision cited by the plurality either does not address the question, see, *e. g.*, *Mississippi Tax Comm'n I*, 412 U. S., at 380–381, or says that the division of authority over territory under concurrent jurisdiction is determined by

---

[17] While the parties do not say when the Grand Forks and Minot Air Force enclaves were acquired, the public record does indicate that as recently as 1962 North Dakota had no territory under partial or concurrent jurisdiction with the Federal Government, see Haines, Crimes Committed on Federal Property—Disorderly Jurisdictional Conduct, 4 Crim. Just. J. 375, 402 (1981), and that the statute ceding exclusive jurisdiction over military bases within its boundaries has been in effect since at least 1943. See Report of the Interdepartmental Committee for the Study of Jurisdiction over Federal Areas Within the States, Part I, p. 190 (1956). Thus, at whatever point this land was acquired, North Dakota consented to its being governed under exclusive federal jurisdiction.

A state statute ceding jurisdiction suffices as consent to exclusive federal jurisdiction under Art. I, § 8, cl. 17 (giving Congress the power to exercise exclusive legislation over land only if the State in which it is located consents). See *Fort Leavenworth R. Co.* v. *Lowe*, 114 U. S. 525 (1885).

the terms of the cession of jurisdiction by the State. See *James* v. *Dravo Contracting Co.*, 302 U. S., at 142 ("If lands are otherwise acquired [not as exclusive jurisdiction enclaves], and jurisdiction is ceded by the State to the United States, the terms of the cession, to the extent that they may lawfully be prescribed, that is, consistently with the carrying out of the purpose of the acquisition, determine the extent of the federal jurisdiction"); *Surplus Trading Co.* v. *Cook*, 281 U. S. 647, 651–652 (1930). Therefore, even were I to accept the proposition that a concurrent jurisdiction federal enclave might be a "State" for purposes of the Twenty-first Amendment, I would regard the State's authority over the North Dakota bases as an open question for which remand for further proceedings, not reversal, is the appropriate action.

## V

Because I find that North Dakota's labeling requirement both discriminates against the Federal Government and its suppliers and obstructs the operations of the Federal Government, I cannot agree with the Court that it is valid. The operations of the Federal Government are constitutionally immune from such interference by the several States.