# Immunity of Smithsonian Institution from State Insurance Laws

The federal government immunity arising from the Supremacy Clause of the Constitution renders the Smithsonian Institution constitutionally immune from state insurance laws and state licensing requirements that would otherwise apply to its issuance of gift annuities.

April 25, 1997

MEMORANDUM OPINION FOR THE ASSISTANT GENERAL COUNSEL
SMITHSONIAN INSTITUTION

This responds to your inquiry regarding the applicability of state insurance laws and licensing requirements to gift annuities that may be issued by the Smithsonian Institution ("Smithsonian").[1] We conclude that the federal governmental immunity arising from the Supremacy Clause of the Constitution renders such laws and requirements inapplicable to the Smithsonian. U.S. Const. art. VI, cl. 2; *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819).

## I. BACKGROUND

The Smithsonian Institution was established by federal legislation 150 years ago to carry out the will of James Smithson, who bequeathed his estate to the United States "for the increase and diffusion of knowledge." Revised Statutes, title 73, §§ 5579–5594, preamble. Among other things, the Smithsonian maintains museums, supports scientific research, and serves as a national center for scholarship, culture, and the arts. *See Expeditions Unlimited Aquatic Enters., Inc. v. Smithsonian Inst.*, 566 F.2d 289, 296 (D.C. Cir. 1977) (en banc), (describing the Smithsonian's function "as a national museum and center of scholarship"), *cert. denied*, 438 U.S. 915 (1978).

The structure, organization, oversight, and management of the Smithsonian are established and governed by federal statute. 20 U.S.C. §§ 41–80q (1994). The Smithsonian Institution is governed by a Board of Regents composed of the Vice President, the Chief Justice, three members each from the Senate and the House, and nine other persons appointed by Congress from outside the government. *Id.* § 42. The Smithsonian receives a substantial portion of its funding from federal appropriations, and a majority of its employees are from the federal civil service. *See Expeditions Unlimited*, 566 F.2d at 296 n.4 (noting that approximately 75% of the Smithsonian's operating funds came from federal appropriations). Further, all moneys "recovered by or accruing to" the Smithsonian are paid into the

---

[1] Letter for Edward J Snyder, Chief, Special Litigation, Tax Division, Department of Justice, from Ildiko P DeAngelis, Assistant General Counsel, Smithsonian Institution (July 18, 1996) ("Smithsonian Letter") Your letter was referred to this Office by the Tax Division

Treasury of the United States, where they are credited to the Smithsonian account. 20 U.S.C. § 53. The Smithsonian is also required to submit various periodic reports concerning its operations, expenditures, condition, and salaries to Congress, and is subject to periodic audits by the General Accounting Office. *Id.* §§ 49, 57–58.

Federal courts and this Office have previously recognized the Smithsonian's status as an establishment, agency, or authority of the federal government, at least in certain contexts. In *Expeditions Unlimited*, for example, the U.S. Court of Appeals for the D.C. Circuit held that the Smithsonian constituted an "independent establishment" falling within the "federal agency" definition of the Federal Tort Claims Act, 28 U.S.C. § 2671 (1994) ("FTCA"), and was therefore entitled to immunity against a defamation action under that act. 566 F.2d at 296.[2] *Accord Genson v. Ripley*, 681 F.2d 1240 (9th Cir.), *cert. denied*, 459 U.S. 937 (1982).[3] Some courts have held that the Smithsonian is an "authority of the United States" which therefore falls within the definition of an "agency" subject to the requirements of the Federal Privacy Act, *Dong v. Smithsonian Inst.*, 878 F. Supp. 244, 245 (D.D.C. 1995),* and that the Smithsonian is "an authority of the government properly subject to the [Freedom of Information Act]." *Cotton v. Adams*, 798 F. Supp. 22, 24 (D.D.C. 1992). *But see* Memorandum for Peter Powers, General Counsel, Smithsonian Institution, from Leon Ulman, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Coverage of the Smithsonian Institution by certain Federal Statutes* (Feb. 19, 1976) ("Ulman Opinion") (discussed below). This Office has similarly concluded that the Smithsonian constitutes an "executive agency" for purposes of the Federal Property Act, 40 U.S.C. §§ 471–544 (1994), although we emphasized that we "express[ed] no opinion on whether the Smithsonian could be considered to be in the executive branch for any other purpose."[4] More recently, this Office has characterized the Smithsonian as a "congressional agency." *See The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C. 124, 172 (1996).

---

* Editor's Note· Subsequent to the issuance of this opinion, the U.S Court of Appeals for the D.C Circuit reversed the District Court opinion in *Dong*, holding that the Smithsonian Institution is not an "agency" for purposes of the Privacy Act. *See Dong v. Smithsonian Inst.*, 125 F 3d 877 (D.C. Cir. 1997), *cert. denied*, 524 U S 922 (1998).

[2] The court wrote.

> Although the Smithsonian has a substantial private dimension, we conclude that the nature of its function as a national museum and center of scholarship, coupled with the substantial governmental role in funding and oversight, make the institution an "independent establishment of the United States," within the "federal agency" definition

*Id* at 296 (footnotes omitted). The court further explained "The substantial federal funding and the important supervisory role played by governmental officials are the most important factors linking it to the government " *Id* at 296 n.6.

[3] *See also Polcari v John F. Kennedy Center for the Performing Arts*, 712 F. Supp. 230, 231 (D.D C. 1989), holding that the Kennedy Center, established by statute as a bureau of the Smithsonian, *see* 20 U S.C. §§ 76h–76q, also constitutes a federal agency for purposes of the FTCA.

[4] *The Status of the Smithsonian Institution Under the Federal Property and Administrative Services Act*, 12 Op. O.L.C. 122, 124 n.1 (1988).

Other historical and legal precedents, however, treat the Smithsonian quite differently. For example, Chief Justice Taft, speaking as Chancellor of the Smithsonian Board of Regents, asserted ''that the Smithsonian Institution is not, and has never been considered a government bureau. It is a private institution under the guardianship of the Government.'' William H. Taft, *The Smithsonian Institution — Parent of American Science* 16 (1927), *quoted in* Ulman Opinion at 8. Moreover, this Office has opined that the Smithsonian is not an ''agency'' within the meaning of the Administrative Procedure Act, the Freedom of Information Act, the Federal Advisory Committee Act, or the Privacy Act. *See* Ulman Opinion. In reaching that conclusion, we observed that the Smithsonian ''performs none of the purely operational functions of government which have been given such significant weight in determinations of agency status in other cases'' and that ''it plays no part in the process of administration, regulation, and government.'' *Id.* at 10.

We are advised that the Smithsonian is now considering the establishment of a gift annuity program as a funding resource. A gift annuity is an arrangement whereby a person donates a certain amount of principal to be held in trust by a non-profit or charitable organization, receiving in return an actuarially calculated annuity for the remainder of the donor's life. *See Ozee v. American Council on Gift Annuities,* 888 F. Supp. 1318, 1321–22 (N.D. Tex. 1995). Although the issuance of gift annuities is generally subject to state regulation and licensing requirements, you indicate your understanding that both the American Red Cross and the U.S. Holocaust Museum currently operate gift annuity programs ''outside the various state licensing schemes.'' Smithsonian Letter at 1.[5] You also note that the Smithsonian has received requests from various states in the past to register under their charitable solicitation laws, but has declined to do so on the ground that it is a federal instrumentality that is immune from such regulation and registration requirements. *Id.* at 2.

Against this background, you have asked for our opinion (1) whether the Smithsonian may properly be subjected to state laws and licensing requirements regulating gift annuities; and (2) whether the Smithsonian may implement a gift annuity program without first obtaining prior recognition from individual state authorities that such state laws do not apply to the Smithsonian.

## II. ANALYSIS

Under the intergovernmental immunity doctrine, the states may not directly regulate the federal government's operations or property. *See Hancock v. Train,* 426 U.S. 167, 178–80 (1976); *Mayo v. United States,* 319 U.S. 441 (1943);

---

[5] For example, the California Department of Insurance has acknowledged that the American Red Cross constitutes a ''federal instrumentality'' and is therefore exempt from California insurance laws and the related requirement to obtain a state license in order to issue gift annuities in California Letter for U S Department of Justice from John M. Fogg, Senior Counsel, California Department of Insurance (Oct 15, 1986) (enclosure to Smithsonian Letter)

*McCulloch v. Maryland*, 17 U.S. at 426; *Arizona v. Bowsher*, 935 F.2d 332, 334 (D.C. Cir.), *cert. denied*, 502 U.S. 981 (1991). As explained in the Supreme Court's landmark decision in *McCulloch*, this rule is firmly rooted in the Supremacy Clause:

> It is of the very essence of supremacy to remove all obstacles to its action within its own sphere, and so to modify every power vested in subordinate governments, as to exempt its own operations from their own influence.

17 U.S. at 427. *See also United States v. Montana*, 699 F. Supp. 835, 837 (D. Mont. 1988) ("Absent congressional consent, the property and functions of the United States are immune from regulation or taxation by the several states.").

Although the scope of federal government immunity from state regulation and taxation has been considerably narrowed over the past several decades, the doctrine applies with full force where a state seeks directly to regulate the federal government. *See, e.g., California State Bd. of Equalization v. Sierra Summit, Inc.*, 490 U.S. 844, 848–49 (1989); *United States v. New Mexico*, 455 U.S. 720, 735 (1982) (excluding certain government contractors from coverage of federal governmental immunity from state taxation). In *North Dakota v. United States*, 495 U.S. 423 (1990), the Supreme Court summarized the current state of the law, as follows:

> The Court has more recently adopted a functional approach to claims of governmental immunity, accommodating of the full range of each sovereign's legislative authority and respectful of the primary role of Congress in resolving conflicts between the National and State Governments. Whatever burdens are imposed on the Federal Government by a neutral state law regulating its suppliers "are but normal incidents of the organization within the same territory of two governments." *A state regulation is invalid only if it regulates the United States directly or discriminates against the Federal Government or those with whom it deals.*

*Id.* at 435 (citations omitted; emphasis added). Thus, to the extent that the application of state insurance laws or licensing requirements to the Smithsonian may be said to "regulate[ ] the United States directly," they are invalid under the federal governmental immunity doctrine as explained in *North Dakota v. United States*.[6]

---

[6] Although we have not been provided detailed information on how the various state insurance laws would affect the proposed gift annuities, we have no indication that they would discriminate against the United States or those dealing with it within the meaning of the *North Dakota* standard.

In determining whether a state law seeks to "regulate the United States directly," the courts look to whether the provision merely imposes an obligation or burden on a government contractor, supplier, or employee, *see, e.g., id.* at 436–37, or whether it seeks to regulate the federal function itself. As the Supreme Court explained in holding that North Dakota's liquor distribution laws, as applied to suppliers of U.S. military facilities, did not violate the immunity doctrine:

> Both the reporting requirement and the labeling regulation operate against suppliers, not the Government, and concerns about direct interference with the Federal Government, *see City of Detroit v. Murray Corp. of America*, 355 U.S. 489, 504–505 (1958) (opinion of Frankfurter, J.), therefore are not implicated.

*Id.* at 437. Such state laws do not regulate the Government directly, and are valid as long as they are not discriminatory against the United States. *Id.* In contrast, state laws purporting to regulate the functions or operations of the Defense Department or the Internal Revenue Service themselves, for example, would constitute direct regulation of the United States under the *North Dakota* formula.

As the Supreme Court further explained in *Mayo v. United States*:

> These inspection fees are laid directly upon the United States. They are money exactions the payment of which, if they are enforceable, would be required before executing a function of government. Such a requirement is prohibited by the supremacy clause. We are not dealing . . . with a tax upon the salary of an employee, or . . . with a tax upon the purchases of a supplier, or . . . with price control exercised over a contractor with the United States. In these cases the exactions directly affected persons who were acting for themselves and not for the United States. These fees are like a tax upon the right to carry on the business of the post office or upon the privilege of selling United States bonds through federal officials.

319 U.S. at 447 (citations omitted).

Because the state insurance laws and licensing requirements in question here would operate directly upon the Smithsonian, the only remaining question is whether the Smithsonian is a part of the federal government itself. In our view, the answer to this question is relatively clear.

In an analogous case, the Ninth Circuit held that the American Red Cross was immune from local taxation based on its status as an instrumentality of the United States. *See United States v. City of Spokane*, 918 F.2d 84 (9th Cir. 1990), *cert. denied*, 501 U.S. 1250 (1991). In so holding, the court stressed that the Red Cross "is no mere private contractor" but, rather, is "imbedded in the structure of the

government'' to the extent that it is '' 'virtually . . . an arm of the Government.' ''
*Id.* at 87–88 (quoting *Department of Employment v. United States*, 385 U.S. 355,
359–60 (1966)).

Here, we believe that the Smithsonian, like the Red Cross, is best regarded
as an instrumentality of the United States that is ''imbedded in the structure of
the government'' — or a ''constituent part'' thereof, *see United States v. New
Mexico*, 455 U.S. at 736 — rather than as a private entity that merely acts on
the Government's behalf pursuant to contract or agency arrangements. The domi-
nant federal governmental role in the Smithsonian's governance, funding, oper-
ations, and oversight is critical in this regard. *See* 41 U.S.C. §§ 41–58 (1994).
Given these factors, we believe the Smithsonian is ''so closely connected to the
Government that the two cannot realistically be viewed as separate entities,'' *see
United States v. New Mexico*, 455 U.S. at 735, for purposes of the intergovern-
mental immunities in question.[7] We therefore believe that the application of state
insurance and licensing laws to the Smithsonian Institution's operations would
''regulate[ ] the United States directly'' within the meaning of *North Dakota v.
United States*, 495 U.S. at 435.

The Supreme Court's decision in *Lebron v. National R.R. Passenger Corp.*, 513
U.S. 374 (1995), lends additional support to our conclusion. In *Lebron*, the Court
held that the National Railroad Passenger Corporation (''Amtrak'') constituted an
agency or instrumentality of the United States for purposes of determining the
constitutional rights of citizens affected by its actions. In so holding, the Court
reasoned that an entity qualifies as ''what the Constitution regards as the Govern-
ment'' if it is government-created and government-controlled. *Id.* at 392. The
Court held that Amtrak was government-created because it was established ''by
special law for the furtherance of governmental objectives,'' and held that it was
government-controlled because federally appointed members of Amtrak's gov-
erning board hold voting control over it. *Id.* at 400.

The Smithsonian is similarly government-created and government-controlled. It
is established by federal statute to carry out a wide range of educational, cultural,
and scientific functions supported by the Government. *See, e.g., Cotton v. Adams*,
798 F. Supp. at 24. Further, all members of its Board of Regents hold their posi-
tions either by virtue of other federal government posts they hold or through
congressional appointment. 20 U.S.C. §§ 42–43. At least for purposes of the inter-
governmental immunity at issue here, we conclude that the Smithsonian must also
be considered ''what the Constitution regards as the Government.'' [8]

---

[7] In reaching this conclusion, we reiterate our view that the unique, hybrid nature of the Smithsonian requires
that its legal or governmental status must be assessed from the particular standpoint of the constitutional, statutory
or regulatory scheme in which questions arise and that broad generalizations regarding the Smithsonian's status
are inappropriate. *See* 12 Op. O.L.C at 123–24

[8] We acknowledge that *Lebron* is distinguishable in at least one essential respect from the question presented
here. In *Lebron*, even an express congressional declaration that Amtrak was not a government agency or instrumen-
tality, *see* 49 U.S.C § 24301(a)(2)–(3) (1994), could not override Amtrak's functional status as a government entity
because, as the Court stated, ''it is not for Congress to make the final determination of Amtrak's status as a Govern-

## CONCLUSION

In light of all the foregoing considerations, we conclude that the Smithsonian cannot be separated from the United States for purposes of intergovernmental immunity and is entitled to immunity from state insurance laws and licensing requirements with respect to its proposed gift annuity program. On the basis of that immunity, which derives from the Supremacy Clause, we believe the Smithsonian may lawfully implement its gift annuity program without first obtaining prior confirmation from state authorities that such state laws and requirements do not apply to it. *See Johnson v. Maryland*, 254 U.S. 51 (1920);[9] *United States v. Montana*, 699 F. Supp. at 836–37. We express no view on the separate issue of whether it would be prudent or practical to proceed with such programs without first consulting with state officials asserting a regulatory interest in those programs.

RANDOLPH D. MOSS
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

ment entity for purposes of determining the constitutional rights of citizens affected by its actions." 513 U.S at 392. In contrast, Congress *is* free to enact a statutory waiver of the inter-governmental immunity that would otherwise protect a federal governmental entity. *E g . Hancock v. Train*, 426 U.S. at 179; *Department of Employment v. United States*, 385 U.S. at 358. However, we find no indication that it has done so with respect to the Smithsonian in this context.

[9] As Justice Holmes stated in his opinion for the Court in *Johnson*:

> It seems to us that the immunity of the instruments of the United States from state control in the performance of their duties extends to a requirement that they desist from performance until they satisfy a state officer upon examination that they are competent for a necessary part of them and pay a fee for permission to go on

254 U.S. at 57